COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES ET AL. *v.* MICHAEL
SULLIVAN ET AL.
(SC 17594)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

Argued September 5, 2007—officially released January 22, 2008

*Wesley W. Horton*, with whom were *James H. Lee* and *Kenneth J. Bartschi*, for the appellants (defendants).

*Cheryl A. Sharp*, assistant commission counsel, for the appellee (named plaintiff).

*Sarah W. Poston*, for the appellee (plaintiff Dennisse Colon).

*Amy Eppler-Epstein* filed a brief for the New Haven Legal Assistance Association et al. as amici curiae.

*Joseph D. Rich* and *Nicole Birch* filed a brief for the Lawyers' Committee for Civil Rights Under Law et al. as amici curiae.

*Opinion*

SCHALLER, J. In this housing discrimination action, the defendants, Michael Sullivan and Robert Sullivan, appeal[1] from the judgment of the trial court in favor of the plaintiffs, the commission on human rights and opportunities (commission) and Dennisse Colon, con-

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the case from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

cluding that the defendants unlawfully had discriminated against Colon, a prospective tenant, on the basis of a lawful source of income in violation of General Statutes § 46a-64c. The defendants claim that: (1) this court should overrule its decision in *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 739 A.2d 238 (1999) (*Sullivan I*); (2) the trial court misapplied *Sullivan I* to conclude that the defendants violated § 46a-64c (a) (1);[2] and (3) the trial court improperly prevented the defendants from litigating fully the reasonableness of Colon's attorney's fees. We agree with the defendants' third claim, and, therefore, reverse in part the judgment of the trial court and remand for further proceedings.

The trial court found the following facts. On February 11, 1998, Colon called the defendants' office in response to a newspaper advertisement she had seen for a residential unit renting for $825 per month. She spoke to the defendants' office manager, Jane Swetckie, who confirmed that the unit was still available. Colon told Swetckie that she wanted to rent the unit, and that she would be living in the unit with her two daughters and her grandchild. She also informed Swetckie that her income was approximately $21,000 per year and that she would be receiving a rent subsidy under section 8 of the National Housing Act, as amended in 1974 and codified at 42 U.S.C. § 1437f (section 8). When Swetckie asked Colon how much she would be receiving as rental assistance from section 8 and informed Colon that the amount of the subsidy would be essential to processing her rental application, Colon responded that she did not know, but would find out. After Colon stated, how-

---

[2] General Statutes § 46a-64c (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section . . .

"(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . lawful source of income . . . ."

ever, that she wished to take occupancy at the end of March, or the beginning of April, 1998, Swetckie responded that the landlord would not hold the unit that long, and the conversation ended amicably.

On February 25, 1998, Colon again called the defendants' office to inquire about the rental because she had noticed that the unit was still advertised in the newspaper as available, and she had determined that she could take occupancy earlier. As soon as Colon identified herself, Swetckie informed her that she did not make enough income to qualify to rent the unit, for which the defendants had set a minimum income requirement of $40,000 per year. When Colon reminded Swetckie that she would be receiving a section 8 supplement, Swetckie repeated that Colon did not qualify. At that point, Colon became upset, raised her voice and became argumentative. She eventually accused Swetckie of discriminating against her and ultimately hung up the telephone on Swetckie.

Colon called back shortly afterwards and again asked Swetckie why she did not qualify. When Colon became agitated, Swetckie placed her on hold and transferred the call to Robert Sullivan. While Colon was on hold, Swetckie presented Sullivan[3] with a handwritten log that Swetckie had created, according to regular office procedure, during her telephone calls with Colon. When Sullivan picked up the call, he immediately informed Colon that she did not qualify to rent the unit because she earned insufficient income, and because he chose not to participate in the section 8 program, which he claimed was voluntary. Colon became upset and hung up the telephone on Sullivan.

Colon next called the fair housing commission for the city of Bridgeport, and reported to Joseph Wincze,

---

[3] Unless otherwise noted, all references in this opinion to "Sullivan" refer to Robert Sullivan.

the director, that the defendants had denied her the rental because she had informed them that she would be receiving a section 8 subsidy. Wincze told Colon that, because it was her word against that of the defendants, there was insufficient evidence of discrimination. He suggested that Colon call the defendants' office again, under the pretext of offering an apology for her earlier behavior, and elicit "incriminating" information from the defendants while Wincze monitored the call. When Colon called the defendants' office, she apologized to Swetckie, who transferred her to Sullivan. Sullivan again told Colon that she did not qualify for the rental because she had insufficient income and because he chose not to participate in the section 8 program. He also added that Colon had bad credit because she was delinquent on a student loan. Colon again became upset and accused Sullivan of surreptitiously checking her credit without her authorization.[4] Sullivan denied this, and Colon hung up the telephone on him.

Colon subsequently filed a complaint with the commission, alleging that the defendants had discriminated against her on the basis of a lawful source of income in violation of § 46a-64c. An investigator for the special enforcement unit of the commission, Kathleen Northup, found reasonable cause to believe that a discriminatory practice had been or was being committed, as alleged in Colon's complaint. In accordance with General Statutes § 46a-83 (d) (2), the defendants elected a civil action in lieu of an administrative hearing. Following a bench trial, the court, relying in part on *Sullivan I*, found in

---

[4] The trial court found that Sullivan had not run a credit check on Colon without her authorization. The court credited Sullivan's testimony that he had obtained the information about Colon's student loan delinquency from Colon herself, who had filed a rental application with the defendants three years prior and had disclosed the information about the loan in that application. The court also found, however, that Sullivan had not attempted to update Colon's credit information or to determine whether Colon had cleared up the delinquency.

favor of the plaintiffs and awarded both compensatory and punitive damages, but declined to award attorney's fees. Subsequently, the court granted the plaintiffs' motion to reargue the issue of attorney's fees, and awarded $59,777 in attorney's fees to Colon, but no fees to the commission. This appeal followed.

Because the defendants' first two claims involve the section 8 program, it is helpful to set forth as background a summary of the structure of that program. "The section 8 program exists '[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing . . . .' 42 U.S.C. § 1437f (a) (1994). Section 8 is a cooperative venture between the federal Department of Housing and Urban Development (HUD) and state and local public housing agencies, which oversee the day-to-day operations of the program.[5] While state and local housing agencies contract with landlords who own dwelling units to make assistance payments, HUD enters into annual contribution contracts with the agencies. 42 U.S.C. § 1437f (b) (1) (1994).

"Although it is the local public housing authorities that actually run the section 8 program, they must do so in accordance with applicable federal regulations. See 24 C.F.R. § 882.101 (1994) (applicability and scope of section 8 regulations). The section 8 program in Connecticut also must comply with state law, including the antidiscrimination provisions of § 46a-64c.

"Section 8 rental assistance is available only to persons who are classified as very low income or as low income within the meaning of 24 C.F.R. §§ 813.102 and

---

[5] "A public housing agency is defined as '[a]ny [s]tate, county, municipality or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of housing for low-income [f]amilies.' 24 C.F.R. § 882.102 (1994)." *Sullivan I*, supra, 250 Conn. 770 n.15.

813.105 (1994).[6] The program permits otherwise qualified tenants to rent private units[7] and to pay personally only a small portion of the total rent, commensurate with their income.[8] The local public housing authority contracts separately with the landlord to pay the remainder of the rent directly to the landlord. 24 C.F.R. § 882.105 (1994)." (Internal quotation marks omitted.) *Sullivan I*, supra, 250 Conn. 769–71.

## I

With this background in mind, we first address the defendants' claim that we should reconsider and overrule this court's decision in *Sullivan I*. The defendants contend that we should overrule our decision in *Sullivan I* because: (1) the subsequent passage of General Statutes § 1-2z requires that *Sullivan I* be overruled because that decision relied on extratextual sources to interpret the statutory provision at issue, even though the words of the statute are plain and unambiguous; and (2) even if the language of § 46a-64c is not plain and unambiguous, the decision ignored extratextual

---

[6] "A low income family is one whose annual income is no more than 80 percent of the median income for the area (adjusted for the size of the family); a very low income family has an annual income of no more than 50 percent of the median income for the area. 24 C.F.R. § 813.102 (1994). Very low income tenants generally are given significant preference over those who are classified as only low income tenants. See, e.g., 24 C.F.R. § 813.105 (1994)." *Sullivan I*, supra, 250 Conn. 770 n.16.

[7] "Section 8 housing assistance typically may be used only for units that rent for no more than 10 percent above the 'fair market rental.' 42 U.S.C. § 1437f (c) (1) (1994); 24 C.F.R. § 882.106 (1994). Fair market rentals are calculated using several criteria, but generally are based on the forty-fifth percentile rent of standard quality rental housing in a particular metropolitan or nonmetropolitan area. 24 C.F.R. § 888.113 (1994)." *Sullivan I*, supra, 250 Conn. 770 n.17.

[8] "The rent payable by the tenant personally is the greater of either 10 percent of the tenant's monthly income, or 30 percent of the tenant's monthly adjusted income. 42 U.S.C. § 1437a (a) (1) (1994). Adjusted income is defined as gross income with deductions for dependent children, elderly and disabled family members, large medical expenses, childcare and other costs. 42 U.S.C. § 1437a (b) (5) (1994)." *Sullivan I*, supra, 250 Conn. 770 n.18.

sources that indicate that *Sullivan I* misconstrued the relation between the prohibition in § 46a-64c against housing discrimination based on a lawful source of income and the statutory exception to that prohibition, which is codified at § 46a-64c (b) (5) and exempts the denial of accommodations solely on the basis of insufficient income. We conclude that *Sullivan I* was correctly decided.

"The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value. . . .

"In evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action,

the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923 A.2d 657 (2007).

In arriving at our decision in *Sullivan I*, which involved the same defendants as in the present case and arose from their refusal to rent to prospective section 8 tenants, we engaged in a detailed statutory construction of § 46a-64c. *Sullivan I*, supra, 250 Conn. 775–89. We summarized the issues as "whether a landlord may avoid renting to otherwise qualified section 8 tenants by requiring the use of a standard lease that deviates from section 8 lease specifications[9] or by insisting on tenant income requirements beyond those contemplated by the state statute." Id., 765. In answering these questions, we construed two interrelated provisions within § 46a-64c. The operative provision, which governs a landlord's refusal to rent to a prospective tenant, provides in relevant part that "[i]t shall be a discriminatory practice in violation of this section . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . lawful source of income . . . ." General Statutes § 46a-64c (a) (1). The second provision, which sets forth an exception to the operative provision, provides that "[t]he provisions of this section with respect to the prohibition of discrimination on the basis of lawful source of income shall not prohibit the denial

---

[9] Although federal regulations required a prospective tenant and a landlord to use a standardized lease and addendum in order to participate in the section 8 program in 1994, when the prospective tenants were rejected in *Sullivan I*; see *Sullivan I*, supra, 250 Conn. 768, 771; the current regulations do not contain such a mandate. See 24 C.F.R. § 982.308 (b) (2007); see also *Sullivan I*, supra, 771 n.19; 24 C.F.R. § 982.308 (1998) (local housing authorities may not require use of standardized lease, but any lease entered into must conform to certain standards).

of full and equal accommodations solely on the basis of insufficient income." General Statutes § 46a-64c (b) (5). " 'Lawful source of income' " is defined in General Statutes § 46a-63 (3) as "income derived from Social Security, supplemental security income, *housing assistance*, child support, alimony or public or state-administered general assistance." (Emphasis added.)

In our interpretation of the applicable statutory provisions, we first looked to the language of the statute, noting that "[t]he statute does not speak directly either to whether the broad prohibition against discrimination based on source of income requires landlords to adhere to the requirements of the section 8 program for prospective section 8 tenants, or whether a landlord's insistence on using its own lease constitutes a defense to the antidiscrimination mandate." *Sullivan I*, supra, 250 Conn. 777. In other words, we began by noting that the words of the statute are not plain and unambiguous as to whether a landlord may opt out of the section 8 program by refusing to use the mandated lease.[10] Only

---

[10] Despite the fact that we made this threshold inquiry, the defendants claim in the present appeal that the enactment of § 1-2z mandates the reversal of *Sullivan I*. General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." The defendants provide no explanation as to how the passage of § 1-2z would yield a different analysis, despite our conclusion in *Sullivan I* that the statutory language was *not* plain and unambiguous, a conclusion that would justify looking to extratextual evidence to ascertain the meaning of the statutory language under any circumstances.

The defendants also make no attempt to clarify or explain the underlying assumption implicit in their claim, offered without any supporting argument or cited authority, that the legislature intended that § 1-2z be applied retrospectively to our past decisions. We rejected an express argument to that effect in *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 477. Specifically, in *Hummel*, the parties had argued that the enactment of § 1-2z required us "to overrule our precedent importing a final judgment requirement into General Statutes § 31-301b, which governs appeals from the compensation review board . . . to the Appellate Court, because § 31-301b does not refer

after arriving at this conclusion did we turn to extratextual sources in order to ascertain the meaning of the statutory language. Id. Looking to the legislative history of the statute, we noted that the provision prohibiting discrimination based on a lawful source of income had been added specifically to address existing housing discrimination against persons receiving rent subsidies. Id., 777–78. We concluded, therefore, that in enacting the provision, "the legislature intended to prohibit landlords from denying rental opportunities to people whose source of income included federal or state housing assistance." Id., 778. We concluded, on the basis of that legislative purpose, that a landlord who refused to use the mandated section 8 lease violated § 46a-64c. Id., 784. We explained that to permit the defendants to opt out of the section 8 program by refusing to use the statutorily mandated lease, "would eviscerate the basic protection envisioned by the statute. It would lead to the unreasonable result that while the legislature mandated that landlords may not reject tenants because their income included section 8 assistance, the legislature at the same time also intended that landlords might avoid the statutory mandate by refusing to accede to a condition essential to its fulfillment." Id., 778.

---

to such a requirement . . . ." Id., 479. In rejecting that contention, we looked to the legislative history of § 1-2z, which revealed that the statute had been enacted in response to this court's decision in *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003), in which we rejected the plain meaning rule. *Hummel* v. *Marten Transport, Ltd.*, supra, 499. Regarding that history, we stated: "It is perfectly clear from this legislative history that the sole purpose of the legislature in enacting § 1-2z was to restore the plain meaning rule that had existed prior to *Courchesne*. There is nothing in the legislative history to suggest that the legislature also intended to overrule every other case in which our courts, prior to the passage of § 1-2z, had interpreted a statute in a manner inconsistent with the plain meaning rule, as that rule is articulated in § 1-2z. We are unwilling to impute to the legislature such a sweeping purpose in the absence of convincing evidence of that purpose. Because neither the language nor the legislative history of § 1-2z provides any such evidence, we conclude that § 1-2z does not overrule our prior case law importing a final judgment requirement into § 31-301b." Id., 501.

We next considered the defendants' argument that "its refusal to rent to the [prospective tenants] . . . was justified by the statutory exception for 'insufficient income.' " Id., 784. At that time, the defendants imposed upon prospective tenants the same income requirements as they do currently; that is, in order to qualify for a rental, a prospective tenant had to earn a weekly income that approximated or equaled one month's rent. Id., 785. In concluding that the defendants did not discriminate on the basis of a lawful source of income in violation of § 46a-64c by refusing to rent to the prospective tenants, neither of whom had met the defendants' income requirements, the trial court in *Sullivan I* had relied on the "[statutory] exception in § 46a-64c (b) (5), which provides that '[t]he provisions of this section with respect to the prohibition of discrimination on the basis of lawful source of income shall not prohibit the denial of full and equal accommodations solely on the basis of insufficient income.' " Id.

Presented with this second issue of statutory construction, namely, the meaning of the phrase insufficient income, we noted that it was not defined by statute.[11] Id., 786. We looked, therefore, to the dictionary definition of the word "sufficient," which is defined in Black's Law Dictionary (6th Ed. 1990) as "[a]dequate, enough, as much as may be necessary, equal or fit *for end proposed*, and that which may be necessary *to accomplish an object*. Of such quality, number, force, or value *as to serve a need or purpose*." (Emphasis in original; internal quotation marks omitted.) *Sullivan I*, supra, 250 Conn. 788. In light of that definition, we turned to the obvious question—insufficient income *for what?* The short answer to that question was *to afford the rental*. In other words, we examined what need or

---

[11] This analysis similarly undermines the defendants' argument that the passage of § 1-2z mandates reversal of *Sullivan I* because the court therein had not applied the plain meaning rule. See footnote 10 of this opinion.

purpose the legislature had in mind when it allowed an exception for insufficient income. We concluded that the reasonable purpose that the legislature would have considered in allowing the exception would have been "the sufficiency of the tenant's income to meeting his or her own financial obligations to the landlord, ordinarily the tenant's own periodic rental obligation." Id. We explained the scope of the exception in the following manner: "[T]he exception affords a landlord an opportunity to determine whether, presumably for reasons extrinsic to the section 8 housing assistance calculations, a potential tenant lacks sufficient income to give the landlord reasonable assurance that the tenant's portion of the stipulated rental will be paid promptly and that the tenant will undertake to meet the other obligations implied in the tenancy." Id., 789. Accordingly, in evaluating whether a section 8 recipient has insufficient income, entitling a landlord to invoke the exception in § 46a-64c (b) (5), only the section 8 recipient's personal rent obligation, along with "other obligations reasonably associated with the tenancy" may be considered. Id., 790. Put another way, a landlord, in deciding not to rent to a prospective tenant, may rely on the statutory exception only with respect to income requirements that bear a reasonable relationship to a prospective tenant's ability to meet his or her personal rental obligations, as well as other obligations that arise from the tenancy.

Eight years have passed since we construed § 46a-64c in *Sullivan I*. The legislature has had ample opportunity since then to revise the statute and has not done so, giving rise to an inference of legislative acquiescence and counseling against disturbing that precedent in the absence of any clear injustice. Moreover, for the reasons that we stated in *Sullivan I*, we remain persuaded that our interpretation of the interplay between the operative provision in § 46a-64c, making it a discriminatory

practice to refuse to rent to a prospective tenant because of a lawful source of income, and the statutory exception, permitting such refusal when the landlord's decision is based solely on insufficient income, struck the appropriate balance by reading the operative provision liberally and the exception narrowly. This reading of the statute is the one most consistent with the statute's remedial purpose. It is a basic principle of statutory construction that remedial statutes should be construed "liberally in order to effectuate the legislature's intent." (Internal quotation marks omitted.) Id., 782. As we have noted previously, the legislative history of the statute reveals that the legislature enacted the provision making it a discriminatory practice to refuse to rent to a prospective tenant because of a lawful source of income "to prohibit landlords from denying rental opportunities to people whose source of income included federal or state housing assistance." Id., 778. It would be inconsistent with the purpose of the provision, as well as basic principles of statutory construction, to construe the exception so broadly that a landlord may set income requirements that are not reasonably related to the personal periodic rental obligations of a prospective tenant who is a section 8 participant.

Our narrow construction of the statutory exception for a refusal to rent based solely on insufficient income is also consistent with basic principles of statutory construction, which direct us to construe statutory exceptions strictly. Id., 787. In concluding that a landlord seeking to invoke the insufficient income exception under § 46a-64c (b) (5) may consider only whether a prospective tenant receiving section 8 assistance has sufficient income to meet his or her tenancy obligations that are not otherwise covered under section 8, we were mindful that "[i]t would be inconsistent with the remedial mandate of § 46a-64c for the legislature to

have afforded to landlords carte blanche authority to define the term insufficient income so as to qualify for the exception in § 46a-64c (b) (5)." (Internal quotation marks omitted.) Id. Such a construction, we noted, "would swallow the statute whole and render it meaningless." Id.

We are unpersuaded by the defendants' contention that *Sullivan I* improperly ignored extratextual sources in striking this balance. Indeed, in support of their argument for a broader reading of the statutory exception, the defendants point to legislative history that either supports our conclusion in *Sullivan I* or simply restates the language of the statutory exception for insufficient income, neither of which is persuasive. Specifically, the defendants claim that, because the two provisions were enacted simultaneously, the meaning of insufficient income may be better understood by consulting the legislative history surrounding the addition of the language " 'lawful source of income' " to the statute. The defendants point to the testimony of Raphael Podolsky, of Connecticut Legal Services, Inc., who, in advocating that the original wording of the bill be changed to insert the word "lawful" before the phrase "source of income," stated: "This bill *does not preclude decisions based on lack of income.* It precludes decisions based on the fact that it comes from a particular source and especially from a governmental benefit." (Emphasis added.) Conn. Joint Standing Committee Hearings, Human Services, Pt. 5, 1989 Sess., p. 1792. These remarks are consistent with our conclusion in *Sullivan I* that insufficient income must be understood to be related to a section 8 participant's individual portion of the periodic rent. That is, under the rule we articulated in *Sullivan I*, a landlord may refuse to rent to a prospective section 8 tenant if the landlord determines that the individual does not earn sufficient income to meet his or her personal rental obligation, along with other obligations

reasonably associated with the tenancy. The defendants omit Podolsky's comment in his written submission to the committee that "the availability of a certificate will ordinarily mean that the applicant is able to afford the apartment." Id., p. 1917. That statement suggests that Podolsky was *not* working under the assumption that landlords would be free to define insufficient income without reference to a section 8 recipient's personal share of the periodic rent. The testimony and written submission, understood together, are inconsistent with the defendants' claim that the testimony shows that the legislature intended for the insufficient income exception to be understood as a free-floating term subject to whatever value a landlord might wish to assign it.

The defendants also point to remarks by the bill's sponsor, Representative Lynn Taborsak, who commented that tenants may be rejected for "insufficient income." 32 H.R. Proc., Pt. 25, 1989 Sess., p. 8776. That remark merely restates the language in the statute. The defendants appear to argue that the only way to give effect to the phrase insufficient income is to allow landlords complete discretion in defining the term. We already have rejected that interpretation as inconsistent with the purpose of the statute.

Finally, the defendants rely on our decision in *Zlokower* v. *Commission on Human Rights & Opportunities*, 200 Conn. 261, 266, 510 A.2d 985 (1986), for the proposition that sufficient income is one of the legitimate objective criteria that may be established by a landlord. We agree that a requirement that a tenant have sufficient income in order to meet the obligations of the tenancy is a legitimate objective criterion. The objective definition of sufficient income that the defendants urge, however, is not legitimate because, as we explained in *Sullivan I*, it does not comport with the antidiscriminatory purpose of § 46a-63c. The mere fact

that the defendants apply their discriminatory standards consistently by enforcing an objective formula that bears no relation to a prospective section 8 tenant's personal share of the periodic rent does not render those standards legitimate.[12]

## II

We next consider the defendants' claim that the trial court misapplied *Sullivan I* to conclude that the defendants violated § 46a-64c. We disagree.

In *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 202, 596 A.2d 396 (1991), we explained that in analyzing housing discrimination claims under our state statutory scheme, "we are guided by the cases interpreting federal fair housing laws . . . . In construing federal fair housing laws, the federal courts have adopted the evidentiary requirements set forth by the United States Supreme Court in federal employment discrimination cases." (Citations omitted.)

"The United States Supreme Court has set forth three theories of discrimination, each of which requires a

---

[12] The defendants also advance a confusing argument based on the portion of *Sullivan I* that analogizes the insufficient income exception in § 46a-64c to the business necessity exception to disparate impact claims. Specifically, in *Sullivan I*, we stated that "the legislative exception for 'insufficient income' can be read as defining and incorporating the 'business necessity' defense that is contemplated by the disparate impact portion of our antidiscrimination law." *Sullivan I*, supra, 250 Conn. 792–93. In making that statement, we were alluding to the general principle that, in an employment discrimination claim, an employer bears the burden of proving business necessity. See J. Hirsch, Labor and Employment in Connecticut (2d Ed. 2007) § 4-3 (c), p. 4-24. Similarly, a landlord who seeks the benefit of the statutory exception for insufficient income bears the burden of demonstrating that the prospective tenant has insufficient income to satisfy the reasonable obligations associated with the tenancy. *Sullivan I*, supra, 793. The defendants misinterpret our reference to the business necessity exception, contending that we somehow conflated the disparate impact and the disparate treatment theories. The defendants read too much into a simple, illustrative analogy.

different prima facie case and corresponding burden of proof. These theories are: (1) the [pretext] theory; see *Texas Department of Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); (2) the disparate impact theory;[13] see *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989); *International Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 357–62, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977); and (3) the [mixed motives] theory. See *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion)." *Miko* v. *Commission on Human Rights & Opportunities*, supra, 220 Conn. 202–203.

The pretext theory and the mixed motives theory bear substantial similarities to each other, making it difficult to distinguish between the two. Both theories require a plaintiff to show, as part of her prima facie case, disparate treatment. *Fernandes* v. *Costa Bros. Masonry, Inc.*, 199 F.3d 572, 579–80 (1st Cir. 1999). The United States Supreme Court explained that " '[d]isparate treatment' . . . is the most easily understood type of discrimination. The [defendant] simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected trait]." *International Brotherhood of Teamsters* v. *United States*, supra, 431 U.S. 335 n.15.

Once a plaintiff has made a prima facie showing of disparate treatment, two distinctions are crucial in determining whether the facts of a given case will trigger a pretext or a mixed motives analysis. First, the pretext theory applies in cases involving a single motive

___

[13] Because the disparate impact theory is not implicated under the facts of the present case, and because none of the parties claims that the trial court properly should have applied it to the plaintiffs' claims, we need not discuss it.

for the disparate treatment, whereas the mixed motives theory applies in multiple motive cases, in which there is at least one improper motive and one proper motive. See *Ostrowski* v. *Atlantic Mutual Ins. Co.*, 968 F.2d 171, 181 (2d Cir. 1992) ("issue [of mixed motives] does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors"). Second, the prima facie case differs for each theory. In a pretext case, a plaintiff must establish that he or she: (1) is a member of a protected class; (2) applied for and was qualified for the benefit or position; (3) suffered an adverse action by the defendant; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. See *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802. In her concurrence in *Price Waterhouse* v. *Hopkins*, supra, 490 U.S. 277, Justice O'Connor explained a plaintiff's required prima facie showing in a mixed motives case: "What is required [to trigger a mixed motives analysis] is . . . direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." The court has since clarified that circumstantial evidence may trigger a mixed motives analysis when such circumstantial evidence is "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [membership in a protected group] was a motivating factor" for the decision. (Internal quotation marks omitted.) *Desert Palace, Inc.* v. *Costa*, 539 U.S. 90, 101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).

The method of proof selected by a plaintiff who alleges that a landlord has discriminated against her depends on the evidence that the plaintiff offers in

support of her prima facie case. *Sullivan I* must be understood within this analytical framework. In that decision we concluded that a landlord's refusal to rent to a prospective section 8 tenant because of the landlord's reluctance to use the statutorily mandated lease, or because he had set income requirements that were unrelated to a recipient's personal share of the periodic rent, constituted discrimination because of a lawful source of income in violation of § 46a-64c. *Sullivan I*, supra, 250 Conn. 778, 789–90. A plaintiff who is able to establish that a landlord's refusal to rent to her was based on either or both of these motives, therefore, effectively has established that the landlord's refusal to rent to her was based on overt discrimination. Such a showing would establish a plaintiff's prima facie case under either the pretext theory or the mixed motives analysis.

In the present case, the plaintiffs elected to proceed under a mixed motives analysis.[14] Under *Price Waterhouse*, a plaintiff alleging discrimination must show as part of her prima facie case that she is a member of a protected class and that an impermissible factor motivated the defendant in making the adverse decision.

[14] Although the plaintiffs proceeded under a mixed motives theory, and the trial court analyzed their claim under the mixed motives analysis, the plaintiffs claimed, and the trial court concluded, that the sole reason motivating the defendants' decision not to rent to Colon was an improper motive, namely, the defendants' aversion to participating in the section 8 program. Both the trial court and the plaintiffs, therefore, approached the case as a single motive case. As we already have explained, a mixed motives analysis presumes the existence of at least two motives: one improper and at least one proper motive. In its memorandum of decision, the trial court expressly stated: "All parties agree that the facts and law of this case are best analyzed under the 'mixed motive' modality . . . ." Because the record does not reflect that the defendants challenged this conclusion in the trial court, and because the defendants do not claim on appeal that the trial court properly should have applied a pretext analysis to the plaintiffs' claim, we need not decide whether the trial court improperly determined that a mixed motives analysis was appropriate.

See *Price Waterhouse* v. *Hopkins*, supra, 490 U.S. 258; see also *Miko* v. *Commission on Human Rights & Opportunities*, supra, 220 Conn. 205. Once the plaintiff has made this showing, the burden then shifts to the defendant to show, by a preponderance of the evidence, that it would have made the same decision even in the absence of the impermissible factor. *Price Waterhouse* v. *Hopkins*, supra, 258. Unlike a defendant's burden in a pretext case, it is not sufficient for the defendant to show that a legitimate, nondiscriminatory reason would have justified the decision. Id., 276 (O'Connor, J., concurring). A defendant may prevail in a mixed motives case only if it can show that it actually was motivated, at the time that the decision was made, by a legitimate reason and that "its legitimate reason, standing alone, would have induced it to make the same decision." Id., 252.

Because the plaintiffs ultimately proceeded under a mixed motives theory,[15] the trial court relied on *Price*

[15] Because the plaintiffs ultimately proceeded under the mixed motives theory, the trial court granted the plaintiffs' motion to preclude evidence that the defendants had acquired during discovery regarding Colon's finances and credit history, unless the plaintiffs later offered evidence in support of a pretext case. The defendants make much of the fact that the plaintiffs initially had intended to proceed under all three theories of discrimination. The defendants concede, however, that the plaintiffs eventually abandoned both the pretext and the disparate impact theories and proceeded solely on the mixed motives theory.

The defendants contend that evidence obtained during discovery was admissible under *Sullivan I*, which stated that, in determining whether a defendant landlord has met its burden of showing that it is entitled to invoke the exception for insufficient income, a fact finder "properly may consider criteria that include, but are not limited to, the potential tenant's income, *personal rental obligation*, foreseeable utility expenses and foreseeable liability for other than ordinary wear and tear." (Emphasis added.) *Sullivan I*, supra, 250 Conn. 792. The defendants appear to argue that we intended to create an exception to the requirement in a mixed motives analysis, that only the information available at the time the adverse decision was made is admissible to establish the actual motivations underlying a defendant's decision. We did not. We note first that there is no indication that the trial court in *Sullivan I* engaged in a mixed motives analysis. Therefore, the question of how our construction of the statutory exception would function

*Waterhouse* in analyzing their claim. The court began its analysis by noting that all the parties had agreed that a mixed motives analysis applied to the plaintiffs' discrimination claim. The trial court concluded that the plaintiffs had established their prima facie case. It was undisputed at trial that Colon was a section 8 participant, a fact that established that she was a member of a protected class under § 46a-64c. Also, the defendants stated several times during the course of the telephone conversations with Colon that one of the reasons for their refusal to rent the unit to her was because of her participation in section 8.

Once the court concluded that the plaintiffs had established their prima facie case, it turned to the defendants, concluding that they had failed to meet their burden to show by a preponderance of the evidence that they would have decided not to rent to Colon even in the absence of the improper motivating factor. Specifically, the trial court found that the defendants' claims that their refusal to rent to Colon was based on the legitimate reasons of insufficient income, bad credit or bad attitude were not credible. In explaining its conclusion, the trial court noted that Colon's supposed bad attitude manifested itself only after the initial rejection in the first telephone call. As for the defendants' claim that they had rejected Colon because of her bad credit, the court noted that Sullivan raised the issue of Colon's delinquent student loan only in the third telephone conversation, that the information the defendants had

in that analytical framework was not before us in that decision. Properly understood, the quoted language from *Sullivan I* means simply that a fact finder may consider all of the relevant expenses in determining whether a landlord has satisfied its burden to show that it qualifies for the insufficient income exception under the statute. Because the defendants in the present case did not rely on Colon's personal rental obligation in determining whether her income was sufficient, the proffered evidence was irrelevant to that question. The evidence was also irrelevant under a mixed motives analysis. Therefore, the trial court properly precluded it.

regarding her credit was three years old and there was no evidence that the defendants had attempted to update that information. Finally, the court concluded that the defendants' claim that Colon had insufficient income could not serve as a legitimate basis for the rejection because the formula that the defendants employed in making that determination was based on the total monthly rent for the unit, rather than on Colon's personal monthly share of the rent. The court, therefore, relied on our opinion in *Sullivan I* to conclude that the defendants did not fall under the exception in § 46a-64c (b) (5), and that their claim that insufficient income could serve as a legitimate basis justifying the refusal to rent to Colon failed. Because the court concluded that the plaintiffs had established their prima facie case, and because the defendants had failed to sustain their burden that they would have refused to rent to her even absent the impermissible motive, the court rendered judgment in favor of the plaintiffs.

Thus, the trial court relied on *Sullivan I* to the extent that our decision in that case compelled its conclusions that: (1) the plaintiffs had established their prima facie case by showing that one of the motivating factors in the defendants' decision was discriminatory, namely, the defendants' reluctance to participate in the section 8 program; and (2) the defendants could not meet their burden under a mixed motives analysis by showing that one of the "proper" reasons underlying their decision was that Colon did not meet their income requirements, because those requirements were not related to her personal share of the periodic rent and expressly had been held to be improper under *Sullivan I*. These two conclusions were essential parts of the trial court's mixed motives analysis of the plaintiffs' claim. Because the trial court, based on its credibility determinations, concluded that the remaining two reasons proffered

by the defendants as legitimate bases underlying their decision at the time it was made, namely, bad credit and bad attitude, did not, in fact, motivate the defendants in refusing to rent to Colon, the trial court properly concluded that the defendants had failed to satisfy their burden to show that they would have made the decision in the absence of the impermissible factor. Accordingly, the trial court properly applied *Sullivan I* in rendering judgment in favor of the plaintiffs.

The defendants contend that the trial court improperly imputed a discriminatory motive to them. We disagree. The defendants argue that, because they believed that the section 8 program was voluntary, and because they did not "stereotype" or "hate" section 8 recipients, but merely refused to rent to them, they did not have the necessary discriminatory animus or "specific intent" required to trigger a mixed motives analysis. Not only do the defendants conflate the intent requirements of criminal law with the requirement to trigger a mixed motives analysis, that there be evidence that an improper, discriminatory reason motivated the adverse decision, but they also mistakenly assume that their lack of animus renders their motives nondiscriminatory. This argument has no merit. A landlord cannot, on the one hand, openly acknowledge that it does not rent to section 8 recipients, and, on the other hand, claim that this admission is not evidence of discriminatory animus because there is no evidence that the landlord bears ill will toward the group. All that is required to trigger a mixed motives analysis is sufficient evidence to allow a fact finder to conclude that a plaintiff's membership in a protected group was a motivating factor for the decision. *Desert Palace, Inc.* v. *Costa,* supra, 539 U.S. 101. It is not a defense in an action alleging discrimination simply to say that one does not dislike members of the protected group. The trial court found that one of the reasons underlying the defendants'

refusal to rent to Colon was her participation in the section 8 program, a reason that the defendants openly admitted more than once in their dealings with Colon, and one that we deemed discriminatory in *Sullivan I.*

The defendants also claim that the trial court improperly discounted the three alternate motivations that they had offered as legitimate bases for their refusal to rent to Colon. As we already have explained in this opinion, one of the reasons relied on by the defendants, that Colon could not meet their income requirements, was not a legitimate, nondiscriminatory reason because the defendants' income requirements were unrelated to Colon's personal share of the periodic rent. As for the remaining two reasons, the trial court rejected those on the basis of its credibility assessment. In other words, the trial court did not believe the defendants' claim that those reasons actually had motivated them in rejecting Colon. It is well established that "[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007).

The trial court found that the defendants' decision to reject Colon was made during the first telephone call on February 25, 1998, when Swetckie informed Colon that she did not qualify for the rental. The court based its conclusion on the following facts: Swetckie

had authority to reject any applicant over the telephone if she determined there was an obvious disqualifier; she was aware of the defendants' inflexible income policy; pursuant to the defendants' regular procedures, Swetckie had discussed with Sullivan the information that Colon had conveyed to her in the prior, February 11, 1998 telephone call; and Swetckie testified at trial that it was the official position of the office that Colon had been rejected once she was told by Swetckie that she did not qualify.[16] Significantly, Colon's bad attitude did not evidence itself until after Swetckie had rejected Colon.[17] That factor, therefore, could not properly be considered in a mixed motives analysis, which focuses only on the factors that motivated the defendants at the time that the decision was made. *Price Waterhouse* v. *Hopkins*, supra, 490 U.S. 252. As for the defendants' claim that the rejection was based on Colon's alleged bad credit, the trial court rejected that contention for several reasons. First, the court noted that, despite their claim that they had on file information regarding a delinquent student loan, which Colon had disclosed three years prior to the defendants' refusal to rent to her, the defendants had made no attempt to update that information to determine the current status of the loan. Second, Sullivan had testified that he was flexible on credit matters and looked to the total credit picture in evaluating an applicant's credit worthiness. Lastly, the court noted that Sullivan had no other information on Colon's credit history. After considering all of these facts, the court concluded that the defendants' claim

[16] The defendants contend that the trial court improperly concluded that Swetckie had authority to bind them because Swetckie, as an employee of the defendants, was their agent. The defendants do not, however, challenge the factual findings on which the trial court based its conclusion. Those facts are sufficient to support the court's conclusion that Swetckie was authorized to reject Colon.

[17] It is ironic that the defendants attempt to rely on Colon's angry response to their discriminatory conduct as a defense justifying that discrimination.

that their rejection of Colon was based on her alleged bad credit was not credible, because by Sullivan's own standards, his information was incomplete, inconclusive and inadequate to support a rejection. The trial court's explanation of its credibility determinations more than suffices under the deferential standard of review that we accord such determinations. On the basis of those determinations, the court properly rejected the two legitimate reasons offered by the defendants as the motivation for their refusal to rent to Colon. As we already have explained, the third reason offered by the defendants, that they rejected Colon because she did not meet their discriminatory income standards, was not a legitimate basis for the decision.

## III

Finally, the defendants claim that the trial court improperly prevented them from litigating fully the reasonableness of Colon's attorney's fees by precluding the defendants from presenting the testimony of the billing attorney. We agree.

The record reveals the following additional relevant facts and procedure. When the trial court issued its memorandum of decision, it awarded no attorney's fees to the plaintiffs because at the time of trial they had not supplied any statement of the fees requested or a description of the services rendered.[18] Subsequently, the plaintiffs each moved for attorney's fees pursuant

[18] The trial court initially concluded that the plaintiffs were required, pursuant to this court's decision in *Smith* v. *Snyder*, 267 Conn. 456, 479, 839 A.2d 589 (2004), to submit their motion for attorney's fees at the time of trial. The court later reconsidered, based on two considerations. First, the court noted that Judge Leonard Cocco, who initially had presided over the case, had indicated to the parties that the court would not entertain a motion for attorney's fees prior to judgment on the merits. Second, the court relied on Practice Book § 11-21, which allows a party to file a motion for attorney's fees within one month following final judgment. See footnote 19 of this opinion.

to General Statutes § 46a-86 (c) and Practice Book § 11-21.[19] The trial court granted the plaintiffs' motion to reargue the issue of attorney's fees,[20] and conducted several hearings on the matter. The court concluded that the commission was not entitled to attorney's fees under the statutory scheme.[21]

The court allowed evidence, however, regarding Colon's claim for attorney's fees. In support of that claim, Colon's attorney, Sarah W. Poston, submitted an affidavit and her billing records, asserting that she had worked more than 200 hours on the case, at her rate of $225 per hour, for a total of approximately $58,000 in fees, not including the time involved in litigating the fees themselves. The defendants did not challenge Poston's hourly rate as unreasonable, but argued that the number of hours that she claimed for the case were excessive and unreasonable. The court denied the defendants' request to call Poston as a witness in order to question her regarding her affidavit and billing records. Throughout the three days of hearings on the issue, the defendants reiterated their objection to this ruling, claiming that the court had hampered their ability to test the reasonableness of Colon's attorney's fees and improperly had allocated to the defendants the

[19] General Statutes § 46a-86 (c) provides: "In addition to any other action taken hereunder, upon a finding of a discriminatory practice prohibited by section 46a-58, 46a-59, 46a-64, 46a-64c, 46a-81b, 46a-81d or 46a-81e, the presiding officer shall determine the damage suffered by the complainant, which damage shall include, but not be limited to, the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and other costs actually incurred by him as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs."

Practice Book § 11-21 provides in relevant part: "Motions for attorney's fees shall be filed with the trial court within thirty days following the date on which the final judgment of the trial court was rendered. . . ."

[20] Although Colon had not filed a separate motion to reargue, the court allowed her to join in the commission's motion.

[21] The commission does not challenge this ruling on appeal.

burden to show that the requested fees were unreasonable, rather than properly placing the burden on Colon to establish the reasonableness of the fees.

In its supplemental memorandum of decision, the court concluded that the billing reports and accompanying affidavit submitted by Poston were sufficiently detailed to allow the court to make a determination as to the reasonableness of the fees. The court further concluded that the records constituted prima facie evidence of the reasonableness of those requested fees. The court was not persuaded by the defendants' attempts to challenge the reasonableness of those fees. The court, in deciding to bar the billing attorneys from testifying, explained that it was concerned that such testimony would take an unduly long time and would add to the defendants' costs. The court noted, however, that the defendants had been free to challenge the reasonableness of the requested fees through the submission of their own affidavits and through the presentation of expert testimony. Noting that the defendants had not presented any expert testimony, the court concluded that the single affidavit submitted by the defendants was irrelevant to the issues presented. Accordingly, the court awarded Colon approximately $59,000 in attorney's fees.

The issue before us is whether a party opposing a request for attorney's fees has a right, during a hearing on the reasonableness of the requested fees, to question under oath a billing attorney who has presented an affidavit in support of those fees. Section 46a-86 (c) provides in relevant part that a trial court that finds a discriminatory practice in violation of § 46a-64c "shall allow reasonable attorney's fees and costs." A trial court's decision to award attorney's fees is reviewable for abuse of discretion. *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 252, 828 A.2d 64 (2003). We recently clarified the basis on which a trial court may

make a determination of the reasonableness of requested attorney's fees, explaining that "more than [a] trial court's mere general knowledge is required for an award of attorney's fees." *Smith* v. *Snyder*, 267 Conn. 456, 472, 839 A.2d 589 (2004). The burden of showing reasonableness rests on the party requesting the fees, and "there is an undisputed requirement that the reasonableness of attorney's fees and costs must be proven by an appropriate evidentiary showing." (Internal quotation marks omitted.) Id., 471. Specifically, we concluded that "there must be a clearly stated and described factual predicate for the fees sought, apart from the trial court's general knowledge of what constitutes a reasonable fee." Id., 477. That factual predicate must include "a statement of the fees requested and a description of services rendered." Id., 479.

We explained that imposing such a preliminary burden on the proponent of the fees "affords the opposing party an opportunity to challenge the amount requested at the appropriate time." Id. It was unnecessary in *Smith* for us to consider what procedural rights were encompassed by the opposing party's right to challenge the amount requested, because the defendants in *Smith* had not opposed the plaintiffs' request for attorney's fees at trial. In the opinion, however, we noted in dicta that when a party against whom attorney's fees are sought "affirmatively [objects] to the submission of evidence in support of the request for attorney's fees"; id., 480 n.14; the opposing party is entitled "to litigate fully the reasonableness of the fees requested." Id., 479 n.14. We illustrated this point by citing our decision in *Barco Auto Leasing Corp.* v. *House*, 202 Conn. 106, 121, 520 A.2d 162 (1987), in which the defendants' attorneys had submitted affidavits in support of the defendants' request for attorney's fees. The trial court overruled the plaintiff's objection that expert testimony was necessary to determine the value of reasonable attorney's fees. The court did not admit the affidavits as evidence,

but did allow them to be included in the file, and instructed the parties to address any further issues regarding attorney's fees in their briefs. Id. This court reversed the judgment of the trial court, concluding that the court had denied the plaintiff "the undisputed right to litigate fully the reasonableness of the attorney's fees . . . ." Id.

We expressly conclude now what was implicit, both in *Smith* and *Barco Auto Leasing Corp.*, namely, that the right to litigate fully the reasonableness of attorney's fees entitles the opposing party to question under oath a billing attorney who has submitted an affidavit in support of the requested fees, in order to challenge the reasonableness of those fees. This rule will ensure that the party opposing the requested fees has available to it the most fair and efficient means of challenging those fees, that is, questioning under oath the very person on whom the court relies in assessing the fees, the billing attorney. It is not a sufficient substitute to limit the opposing party to filing opposing affidavits or calling expert witnesses. Allowing the challenging party this right will also aid the court in making its determination regarding the reasonableness of those fees. It would be inconsistent with the placement of the burden on the requesting party, and with our statement in *Smith* that an opposing party should have the right to litigate fully the issue of reasonableness, to allow the requesting party to present an affidavit by the billing attorney in support of the reasonableness of the requested fees, without allowing the opposing party to test that evidence by questioning the affiant under oath.

The judgment is reversed only as to the award of attorney's fees and the case is remanded to the trial court for an evidentiary hearing limited to the issue of the amount of attorney's fees. The judgment is affirmed in all other respects.

In this opinion the other justices concurred.