******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., dissenting. The certified questions from the United States District Court for the District of Connecticut[1] present us with a choice among three alternatives. The first alternative is to conclude that, consistent with our prior statutory interpretation, a rate limiting statute within the pawnbroking statutory scheme, General Statutes § 21-44,[2] regulates the rates that pawnbrokers may charge in repurchase transactions. The second choice is to conclude that the general usury statute, General Statutes § 37-4,[3] which expressly exempts pawnbrokers from its scope, nonetheless regulates pawnbrokers and restricts the rates that they may charge in repurchase transactions. Finally, we could conclude that there are no limits on the rates that pawnbrokers may charge for repurchase transactions, a proposition that we rejected in the same decision in which we concluded that pawnbrokers are indeed governed by the pawnbroking statutes when they loan money to clients, even when the pawnbrokers designate the loan by another name. See *Rhodes* v. *Hartford*, 201 Conn. 89, 513 A.2d 124 (1986).

Like the District Court, I conclude that the reasonable interpretation of the sparse legislative record accompanying the 1997 amendment to § 21-44; Public Acts 1997, No. 97-164, § 5 (P.A. 97-164); is that it fails to reveal a clear intent to overrule *Rhodes*, and, therefore, this court's interpretation of General Statutes (Rev. to 1985) § 21-44 in *Rhodes* controls. By contrast, contrary to our prior interpretation of the pawnbroking statutes in *Rhodes* and in the absence of any clear evidence of legislative intent to overrule that decision, the majority concludes today that the rate restrictions of § 21-44 do not apply to a pawnbroker's loan of money upon the deposit of personal property, so long as the pawnbroker has designated that loan by the name "repurchase transaction" rather than "pawnbroking loan." Instead, in direct contradiction to the express exclusion of pawnbrokers from the rate restrictions set forth in § 37-4, the majority concludes that, if pawnbrokers assign the label "repurchase transaction" to a transaction involving the loan of money on the deposit of personal property, § 37-4 does, in fact, apply to pawnbrokers. For two reasons, I cannot agree with the majority's conclusions. First, the majority's conclusion that § 21-44 does not apply to repurchase transactions runs counter to our case law, in which we consistently have required unequivocal evidence of legislative intent before concluding that the legislature overruled one of our decisions interpreting a statute. The majority accomplishes this result without ever expressly addressing the question of whether the legislature intended to overrule *Rhodes* through its enactment of P.A. 97-164, thereby injecting uncertainty into the precedential force and

effect of this court's interpretive decisions. Second, even if I agreed with the majority's unspoken holding that *Rhodes* has been legislatively overruled, I could not agree with its conclusion that § 37-4 governs repurchase transactions, which: (1) is inconsistent with the plain language of the statute exempting pawnbrokers from the rates set forth therein; (2) relies on a series of unsupported assumptions regarding the legislative intent underlying P.A. 97-164; and (3) fails to give proper effect to this court's prior interpretation of the relevant statutory language in § 37-4. Rather than follow the convoluted path taken by the majority to its interpretation of § 37-4, I would hold that, if the legislature overruled *Rhodes*, a proposition with which I disagree, the only logical conclusion remaining would be that the legislature intended to allow pawnbrokers to charge any rate, without limit, to the loan of money on the deposit of personal property, so long as pawnbrokers use the label "repurchase transactions." As I have already stated, I would conclude that *Rhodes* continues to control, and that a pawnbroker's repurchase transactions are governed by § 21-44 of the pawnbroking statutes. Accordingly, I respectfully dissent.

I

## REPURCHASE TRANSACTIONS ARE GOVERNED BY THE PAWNBROKING STATUTES

The majority acknowledges that in *Rhodes* v. *Hartford*, supra, 201 Conn. 89, this court interpreted General Statutes (Rev. to 1985) § 21-44 to govern repurchase transactions, but the majority then lays the foundation for its subsequent analysis by characterizing the rationale of *Rhodes* very narrowly. Without directly stating so, the majority infers that the legislature overruled *Rhodes* by deleting the phrase "directly or indirectly" from § 21-44; P.A. 97-164; despite the equivocal nature of the substantive changes to § 21-44 made by the 1997 amendment, the eleven year gap between the publication of *Rhodes* and the 1997 amendment to § 21-44, the lack of any statement of legislative intent to overrule this court's decision in *Rhodes*, and the fact that P.A. 97-164 had a purpose wholly unrelated to the financing arrangements of pawnbroking transactions. In so doing, the majority fails to give proper weight to a long line of decisions of this court, in which only clear evidence in the legislative record has been held sufficient to support a conclusion that the legislature intended to overrule this court's interpretative decision. The majority also fails to give proper effect to the most fundamental principle underlying *Rhodes*: that repurchase transactions are pawnbroking loans by another name.

In part I of this dissent, I begin with *Rhodes*, in which this court rested its conclusion on broader principles than acknowledged by the majority. I then detail several decisions that illustrate our consistent reliance only on clear evidence of legislative intent to support a conclu-

sion that the legislature intended to overrule one of our decisions interpreting a statute. Applying that standard, I evaluate the legislative record, concluding that such clear evidence of legislative intent is lacking therein.

The issue of whether § 21-44 regulates the rates that pawnbrokers may charge in repurchase transactions presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See *Kasica* v. *Columbia*, 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent). Notwithstanding the passage of § 1-2z, in our construction of statutes, this court's starting point, when we already have interpreted the statute in question, is our prior construction of that statute. See id., 93–94 (in interpreting statutory text, we are bound by our prior constructions of statute); *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 500–501, 923 A.2d 657 (2007) (§ 1-2z did not overrule this court's prior interpretations of statutes). This approach is consistent both with the principle of stare decisis and the principle that our prior decisions interpreting a statute are not treated as extratextual sources for purposes of construing that statute and may be consulted as part of our reading of the statutory text. See, e.g., *Kasica* v. *Columbia*, supra, 94 (relying on prior construction of statute during plain language portion of § 1-2z analysis); *In re Elvin G.*, 310 Conn. 485, 500–501, 78 A.3d 797 (2013) (same).

Therefore, because this court already has construed General Statutes (Rev. to 1985) § 21-44 in *Rhodes* v. *Hartford*, supra, 201 Conn. 89, to apply to repurchase transactions, prior to the enactment of P.A. 97-164, the question of statutory construction in the present case is a narrow one. That is, I begin with the question of whether the legislature intended to overrule this court's decision in *Rhodes* when it amended General Statutes (Rev. to 1997) § 21-44 in P.A. 97-164. Put simply, if the legislature did not intend to overrule *Rhodes* by amending § 21-44 in 1997, then *Rhodes* controls. I observe further that in light of the presumption that the legislature is aware of our decisions construing statutes; *Blonski* v. *Metropolitan District Commission*, 309 Conn. 282, 304, 71 A.3d 465 (2013); the majority's failure to begin with the question of whether the legislature intended in P.A. 97-164 to overrule *Rhodes* subverts the goal of statutory construction, to discern the intent of the legislature. Accordingly, I begin by reviewing this court's previous interpretation of General Statutes (Rev. to 1985) § 21-44 in *Rhodes*.

We defined the issue presented in *Rhodes* as "whether a pawnbroker who engages in a repurchase transaction is, for purposes of [General Statutes (Rev. to 1985)] § 21-44, a pawnbroker who takes or receives, directly or indirectly, interest in return for the use of money he

loans on the pledge of personal property." *Rhodes* v. *Hartford*, supra, 201 Conn. 94. At the time that we decided *Rhodes*, General Statutes (Rev. to 1985) § 21-44 provided: "No pawnbroker or loan broker or person who loans money on the pledge of personal property shall take or receive, *directly or indirectly*, for the use of money loaned on personal property, any more than the following rates: For the use of money amounting to fifteen dollars or less, five per cent per month or fraction thereof; for the use of money exceeding fifteen dollars in amount and not exceeding fifty dollars in amount, three per cent per month or fraction thereof; for the use of money exceeding fifty dollars in amount, two per cent per month or fraction thereof." (Emphasis added.)

Our construction of General Statutes (Rev. to 1985) § 21-44 in *Rhodes* was guided by the remedial purpose of the pawnbroking statutes, which were enacted "to protect impecunious borrowers from extortionate interest rates and oppressive financing terms that some pawnbrokers might otherwise impose." *Rhodes* v. *Hartford*, supra, 201 Conn. 97. We specifically observed that, at the time that the predecessors of General Statutes (Rev. to 1985) §§ 21-44 and 21-45[4] were enacted, repurchase transactions "were recognized as vehicles used by unscrupulous pawnbrokers to extract usurious interest rates from their customers." Id.

Consistent with our recognition that one of the remedial purposes of the pawnbroking statutes was to prevent pawnbrokers from relying on repurchase transactions to legitimize usurious lending practices, our construction of General Statutes (Rev. to 1985) § 21-44 in *Rhodes* was firmly grounded on the principle that repurchase transactions differ from conventional pawnbroking loans in name only. Id., 96. Moreover, our statement in *Rhodes* that the two transactions are equivalent must be understood in light of our express recognition that pawnbrokers historically have relied on their ability to choose among the two labels for pawnbroking transactions, repurchase transactions and pawnbroking loans, in order to circumvent restrictions on the interest rates that they may charge. Id. That is, we recognized in *Rhodes* that, when possible, pawnbrokers historically had taken advantage of different legal rules that applied to the purportedly different pawnbroking transactions—pawnbroking loans and repurchase transactions—and that pawnbrokers had relied on their ability to evade pawnbroking laws by selecting the more advantageous label for the transaction, despite the fact that, in actuality, the two types of transactions are indistinguishable. Id., 96–98; see also S. Levine, A Treatise on the Law of Pawnbroking (1911), pp. 115–16.

The court in *Rhodes* turned to the language of General Statutes (Rev. to 1985) § 21-44, therefore, with three principles serving as its analytical foundation: the pawn-

broking statutes have the remedial purpose of protecting impecunious borrowers from usurious interest rates; pawnbroking loans and repurchase transactions are distinguishable in name only; and, when possible, pawnbrokers have capitalized on that very limited distinction, and relied on any different legal treatment accorded to the two transactions in order to evade interest rate restrictions on pawnbroking transactions. The court then deliberated the significance of the provision that General Statutes (Rev. to 1985) § 21-44 applied to rates received by pawnbrokers either "directly or indirectly, for the use of money loaned on personal property . . . ." *Rhodes* v. *Hartford*, supra, 201 Conn. 94. We observed that, by expressly stating that the restrictions imposed by General Statutes (Rev. to 1985) § 21-44 applied not only to direct, but also to indirect interest rates, "the legislature indicated that it intended the statutes to regulate not only those transactions that take the classic form of a conventional pawnbroking loan, but also financing arrangements that, in substance if not in form, amount to the economic equivalents of such a loan." Id., 96. We explained: "The difference between the repurchase price and the original sales price of the item amounts to a fee that the customer must pay for the use of the pawnbroker's money. Whether or not the parties to the transaction *label* it as interest, this premium constitutes the type of indirect interest envisaged by the drafters of §§ 21-44 and 21-45." (Emphasis added.) Id. Thus, this court's analysis rested firmly on the principle that the only distinction between repurchase transactions and pawnbroking loans was the label that the pawnbrokers applied to the transaction. Indeed, we cited with approval the trial court's apt summary of the situation: "[O]ne should not be able to avoid a tax on shoes by calling shoes slippers . . . ." (Internal quotation marks omitted.) Id., 92. Therefore, because the difference was one in label only, we viewed repurchase transactions as charging the client for the use of money loaned, and we interpreted the concept of "indirect interest" to encompass the rate charged in a repurchase transaction, notwithstanding the fact that the transaction is labeled a "repurchase transaction" rather than a "loan," and the rate is designated as a "fee" imposed on the service rather than "interest" charged on the principal of the loan. We concluded, therefore, that General Statutes (Rev. to 1985) § 21-44 regulated the rates charged by pawnbrokers in repurchase transactions. Id., 103. The majority is incorrect, therefore, in suggesting that the analysis in *Rhodes* rested solely on the inclusion of the word "indirectly" in General Statutes (Rev. to 1985) § 21-44. Certainly, we relied on the inclusion of that term as part of our analysis, but the more important, fundamental principle guiding our analysis was the recognition that repurchase transactions and pawnbroking loans are distinct in name only.

Eleven years after this court's decision in *Rhodes* v. *Hartford*, supra, 201 Conn. 89, the legislature enacted P.A. 97-164, "An Act concerning the Regulation of Pawnbrokers." Section 5 of P.A. 97-164 amended General Statutes (Rev. to 1997) § 21-44, and, among other changes, deleted the phrase "directly or indirectly." The majority relies on the deletion of the words "directly or indirectly" from § 21-44 to infer a legislative intent to overrule *Rhodes*. I disagree that the omission of that phrase, viewed in the context of the entire legislative record, provides clear evidence that the legislature intended that § 21-44 henceforth apply only to conventional pawnbroker loans.

Although we have not expressly stated what evidence is sufficient to allow us to conclude that a legislative amendment was intended to overrule our prior decision construing a statute, we consistently have required clear evidence in the legislative record to support such a conclusion. In most instances, we have relied on express statements by legislators during floor debate to conclude that the legislature intended to overrule one of our decisions interpreting a statute. See, e.g., *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 503–504 (*Borden, J.*, concurring) (observing that express statements of legislators in legislative history of § 1-2z clarified legislative intent to overrule in part this court's decision in *State* v. *Courchesne*, 262 Conn. 537, 816 A.2d 562 [2003]); *In re Michael S.*, 258 Conn. 621, 628–29, 784 A.2d 317 (2001) (relying on testimony before Judiciary Committee that No. 86-185 of 1986 Public Acts was intended to address "a recent [S]upreme [C]ourt case in 1985 that says you can't take an appeal if the [S]uperior [C]ourt . . . moves a child . . . from the juvenile docket to the regular docket" to conclude that act was intended to overrule *In re Juvenile Appeal [85–AB]*, 195 Conn. 303, 488 A.2d 778 [1985] [internal quotation marks omitted]); *Allard* v. *Liberty Oil Equipment Co.*, 253 Conn. 787, 801–802, 756 A.2d 237 (2000) (relying on express statements by legislators to conclude that legislative history made "clear" that principal purpose of No. 99-69 of 1999 Public Acts was to legislatively overrule in part this court's decision in *Bhinder* v. *Sun Co.*, 246 Conn. 223, 717 A.2d 202 [1998]).

Moreover, in the absence of an express statement of legislative intent, we have interpreted subsequent legislation, to the extent possible, to be consistent with our prior decisions, and have specifically declined to draw inferences that were not directly supported by the legislative record of legislation enacted in response to one of our decisions. For example, in *Gormbard* v. *Zurich Ins. Co.*, 279 Conn. 808, 820–21 n.8, 904 A.2d 198 (2006), we concluded, on the basis of express statements during the floor debate on No. 83-461 of the 1983 Public Acts, that the legislature intended to overrule this court's holding in *Harvey* v. *Travelers Indemnity*

*Co.*, 188 Conn. 245, 248, 449 A.2d 157 (1982), in which this court had interpreted General Statutes § 38-175c to require as a matter of public policy that "an insurer . . . provide uninsured motorist coverage for injuries that an insured sustains while occupying an uninsured vehicle that the insured, or a family member of the insured, owns." *Gormbard* v. *Zurich Ins. Co.*, supra, 820 n.8. We declined, however, to read the legislative overruling of the *Harvey* decision more broadly, observing that "[t]here is nothing in the language of the 1983 amendment or in the relevant legislative history, however, to indicate that the legislature disagreed with our determination in *Harvey* that, as a general matter, uninsured motorist benefits must be portable if they are to fulfill the broad remedial purpose of the [uninsured motorist] statute." Id., 821 n.8; see also *Kalams* v. *Giacchetto*, 268 Conn. 244, 260–61 n.11, 842 A.2d 1100 (2004) (declining to read legislature's prompt, subsequent amendment of General Statutes [Rev. to 1999] §§ 51-241 and 51-243, which added presumption of unity of interest for purposes of determining each party's number of peremptory challenges, and imposed proportional limits on number of peremptory challenges party may be allowed; Public Acts 2001, No. 01-152, §§ 1, 2; as evidence of legislative intent to pass contrary legislation overruling *Marshall* v. *Hartford Hospital*, 65 Conn. App. 738, 783 A.2d 1085, cert. denied, 258 Conn. 938, 786 A.2d 425 [2001], where Appellate Court applied General Statutes [Rev. to 1999] §§ 51-241 and 51-243 to conclude that defendants who lacked unity of interest were entitled to four peremptory challenges each). These decisions illustrate that we draw an inference that the legislature has intended to overrule one of our interpretive decisions only when necessary, and only to the extent necessary.

It makes sense in light of our role to apply this presumption—that in the absence of clear and unequivocal evidence of legislative intent to overrule one of our prior interpretive decisions, that decision continues to control the meaning of the relevant statutory provision. It is our province to say what the law means. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803) ("[i]t is emphatically the province and duty of the judicial department to say what the law is"). Once this court has spoken on the meaning of a statute, the presumption is that if the legislature disagrees with our interpretation, it will express its intent clearly and unequivocally.

In the present case, the legislative record does not provide clear evidence that the legislature intended to overrule *Rhodes* when it amended § 21-44 in 1997. I begin with the two most obvious reasons for my conclusion: the amendment happened eleven years after *Rhodes* was decided, and there is no mention whatsoever of *Rhodes* in the legislative record. The eleven year gap between the release of this court's decision

in *Rhodes* and the enactment of P.A. 97-164 is a long time. As I have noted previously in this dissent, this court presumes that the legislature is aware of our interpretation of a statute. *Blonski* v. *Metropolitan District Commission*, supra, 309 Conn. 304. Therefore, in inferring legislative intent on the basis of the legislature's response, or lack thereof, to our interpretation of a statute, we have placed great emphasis on the passage of time between the release of a decision of this court and any relevant legislative action or inaction. For example, we have relied on the prompt, subsequent passage of contrary legislation as evidence that a legislative amendment to a statute was passed directly in response to one of our decisions. See, e.g., *Federal Deposit Ins. Corp.* v. *Hillcrest Associates*, 233 Conn. 153, 167–68 n.7, 659 A.2d 138 (1995) (observing, with respect to enactment of responsive legislation one year following decision of this court, that "[a]lthough there is no printed legislative history available for [the] statutory amendment, its passage so promptly after the decision in *Dime Savings Bank* v. *Pomeranz*, [123 Conn. 581, 196 A. 634 (1938)], compels the inference that it was enacted in response to that decision"). By contrast, one of the indicators of legislative acquiescence to our interpretation of a statute is the passage of "an appropriate interval [of time] to permit legislative reconsideration . . . without corrective legislative action . . . ." *Hummel* v. *Marten Transport, Ltd.*, supra, 282 Conn. 494–95. Although we have never identified a particular length of time that we will consider sufficient to constitute an "appropriate interval" to provide support for an inference of legislative acquiescence, we have relied on intervals significantly shorter than eleven years to support that inference. See, e.g., *Commission on Human Rights & Opportunities* v. *Sullivan*, 285 Conn. 208, 221, 939 A.2d 541 (2008) (eight years); *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 252, 756 A.2d 1264 (2000) (six years). The passage of eleven years between *Rhodes* and the enactment of P.A. 97-164, accordingly, makes one question whether the legislature was targeting *Rhodes* when it amended § 21-44 in 1997.

One would expect that, if the legislature did indeed wait eleven years before overruling *Rhodes*, it would have been aware of the need to make its intent even more clear than in those cases in which it has reacted quickly to overrule one of our interpretive decisions. That expectation finds further support in the drastic and controversial nature of a reversion to the pre-*Rhodes* system, which allowed pawnbrokers to select which laws govern their transactions simply by selecting the more advantageous label. This is not the kind of change that would have passed without even so much as a nod. The legislative record, however, confirms what the eleven year gap suggests. The legislature did not have *Rhodes* in mind at all when it amended General Statutes

(Rev. to 1997) § 21-44 in P.A. 97-164. Neither the substantive changes to the statute nor the legislative record provides anything even approaching clear evidence that the legislature intended to overrule *Rhodes*.

The substance of the 1997 amendment to § 21-44, for instance, at best yields equivocal evidence of the legislature's intent. The defendants point to the fact that in 1997, P.A. 97-164 deleted from § 21-44 the key statutory term on which this court in *Rhodes* relied to conclude that the statute extended to repurchase transactions—the term "indirectly." In *Rhodes*, we interpreted "indirectly" to refer to "indirect interest," a term that we read to encompass the "fee" charged in repurchase transactions. *Rhodes* v. *Hartford*, supra, 201 Conn. 96. I disagree with the majority that the fact that the legislature deleted the entire phrase, rather than deleting only the term "indirectly," is insignificant. The deletion of the term "directly," prevents the change from constituting clear and unequivocal evidence of legislative intent to overrule *Rhodes* and makes it possible to construe the amendment in a manner consistent with *Rhodes*, in which we relied only on the inclusion of the term "indirectly" in General Statutes (Rev. to 1985) § 21-44 to conclude that the statute governed repurchase transactions. In order to legislatively overrule *Rhodes*, therefore, the legislature needed only to delete the term "indirectly" and leave the term "directly" in place. With that amendment, § 21-44 would have provided that "[n]o pawnbroker . . . shall take or receive, *directly*, for the use of money loaned on personal property, any more than the following rates . . . ." Such a change would have removed all doubt regarding the legislature's alleged intent to exclude repurchase transactions from the purview of § 21-44. The omission of both terms, by contrast, arguably leaves the original meaning of the statutory language intact, because under the current revision, § 21-44 applies to rates received, without any limitation as to the manner in which the rate is received, for the use of money loaned on personal property.[5]

The purpose of P.A. 97-164 further undercuts the majority's conclusion. The Public Act was focused on increasing the record keeping requirements on pawnbrokers to aid law enforcement in the "control of [the] flow of stolen goods." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1997 Sess., p. 1233, testimony of John M. Bailey, Chief State's Attorney. The applicable rate restrictions governing pawnbroking transactions were not even remotely part of that agenda. The complete lack of legislative focus on pawnbroking interest rates is further supported by the absence of any testimony offered to the Judiciary Committee or any remarks made on the Senate and House floors that indicated, either expressly or impliedly, that the legislature intended to make any change in the rate restrictions governing pawnbroking transactions, and the lack of

any reference whatsoever in the legislative record to the *Rhodes* decision. The absence of *any* remarks addressing rate restriction changes to § 21-44 reinforces the conclusion that the legislature's intent in enacting P.A. 97-164 in 1997 focused on the sole purpose of the act, to aid law enforcement in the control of the flow of stolen goods, and that this court's holding in *Rhodes* was simply not its concern. In summary, the majority's position, that the legislature intended to overrule *Rhodes* by deleting the word "indirectly" from General Statutes (Rev. to 1997) § 21-44, would require the assumption that, eleven years after our decision in *Rhodes*, the legislature intended to effect a major change in the law, despite the lack of any acknowledgment of its intent to do so, in a public act that was not focused on regulating interest rates. It is unreasonable to presume that the legislature would effect such a major change in the law in such a circumspect and stealthy manner.

The majority relies on changes made by P.A. 97-164 to three of the pawnbroking statutes to argue that the legislative intent is clear. General Statutes (Rev. to 1997) §§ 21-41 and 21-42 were amended to incorporate references to repurchase transactions; P.A. 97-164, §§ 3, 4; and General Statutes (Rev. to 1997) § 21-47 was amended to add a reference to outright purchase transactions; P.A. 97-164, § 7; transactions which the majority inexplicably characterize as repurchase transactions. I discount the majority's mistaken reliance on the 1997 change to § 21-47 as irrelevant and do not address it.[6] I disagree that the changes to §§ 21-41 and 21-42 in the 1997 amendment rise to the level of clarity that we consistently have required to infer legislative intent to overrule one of our decisions. Significantly, the reference to repurchase transactions in General Statutes (Rev. to 2011) § 21-41 (a) was subsequently deleted by No. 11-100, § 4, of the 2011 Public Acts (P.A. 11-100). Applying the majority's reasoning, we should conclude that the deletion of the reference to repurchase transactions from § 21-41 (a) means that the legislature signified an intent that § 21-41, which sets forth record keeping and proof of identity requirements and provides protection for minors, does not apply so long as a pawnbroker labels the transaction a repurchase transaction.

The majority also relies on a single relevant change in P.A. 11-100, which added a reference to repurchase transactions to General Statutes § 21-45. What the majority overlooks is that although § 21-45 now mentions repurchase transactions, the language of the statute conflates repurchase transactions and pawnbroking loans in a manner that supports the conclusion that the legislature intended to subject the transactions to the same rules. The full text of § 21-45 provides: "No pawnbroker shall sell or dispose of any personal property left with such pawnbroker in deposit or pledge for money loaned or *as a result of the purchase of such property on*

*condition of selling the same back again at a stipulated price* in less than sixty days from the date when the same is left in deposit or pledge or *purchased on condition of selling the same back again at a stipulated price*, except when such sale or disposition is to the person who deposited, pledged or sold such property or an authorized agent of such person. All such property may be sold or disposed of at the place of business of such pawnbroker or at public sale after such sixty-day period. Upon the expiration of sixty days from the date when such property is left with a pawnbroker, if the person who deposited or pledged such property fails to redeem any such property in accordance with the terms of the transaction, such right of redemption or repurchase on the part of the person who deposited or pledged such property shall be extinguished and the pawnbroker shall acquire the entire interest in the property that was held by the person who deposited or pledged such property prior to such deposit or pledge without further notice to such person." (Emphasis added.)

The first sentence of § 21-45, which imposes a sixty day waiting period before a pawnbroker may sell or dispose of personal property left with the pawnbroker, specifies two means by which property may be "left with such pawnbroker": (1) in deposit or pledge for money loaned; or (2) as a result of the purchase of such property on condition of selling the same back again at a stipulated price. In the first sentence of § 21-45, depositing and pledging personal property are treated as part of a pawnbroking loan transaction, and purchasing personal property on condition of selling the same back again at a stipulated price is treated as part of a repurchase transaction. The final sentence of § 21-45, however, makes no mention of property that the pawnbroker has acquired by means of a purchase, and expressly applies only to property that has been "deposited or pledged." One would expect, therefore, that the final sentence of § 21-45 would apply only to pawnbroking loans, because items of property that are the subject of repurchase transactions are not "deposited or pledged" but are "purchased on condition of selling the same back again at a stipulated price." The final sentence of § 21-45, however, provides that after the sixty day waiting period, the "right of redemption or *repurchase*" is extinguished. (Emphasis added.) This conflation of the two types of transactions—in the statute that the court in *Rhodes* specifically read together with § 21-44—provides strong support for my reading of the pawnbroking statutes, namely, that the legislature's intent in the pawnbroking statutes, consistent with this court's decision in *Rhodes*, is to treat repurchase transactions and pawnbroking loans as interchangeable.[7]

If the legislature had intended to overrule *Rhodes*, it could have made its intent clear by amending the pawnbroking statutes to reject the fundamental princi-

ple articulated in *Rhodes*, that pawnbroking loans and repurchase transactions should be treated as interchangeable.[8] That is, the legislature could have defined "repurchase transactions" and "pawnbroking loans" as separate and distinct transactions. When the legislature enacted P.A. 11-100, however, which added a new definitional section, General Statutes § 21-39a, to the pawnbroking statutory scheme, it did not add definitions for pawnbroking loans or repurchase transactions. Instead, P.A. 11-100, § 1, added a definition of pawnbroker as "a person who is engaged in the business of loaning money on the deposit or pledge of wearing apparel, jewelry, ornaments, household goods or other personal property or purchasing such property on condition of selling the same back again at a stipulated price . . . ." General Statutes § 21-39a (1). The business of pawnbroking, therefore, is defined to include both types of transactions: conventional pawnbroking loans and repurchase transactions.[9]

This broad definition supports a commonsense interpretation of the statutory scheme, which is that it governs pawnbrokers regardless of which label they append to their transactions. We recognized this in *Rhodes*, when we offered this very practical insight into our statutory construction of General Statutes (Rev. to 1985) § 21-44: "It would have been unreasonable for the legislature to have required pawnbrokers who conduct repurchase transactions to be licensed, without also requiring their compliance with [the] other pawnbroking statutes." *Rhodes* v. *Hartford*, supra, 201 Conn. 103. The court in *Rhodes* abided by a basic tenet of statutory construction, that we do not abandon common sense when we undertake the task of interpreting a statute. "[W]e will not undertake an examination of [a statutory provision] with blinders on regarding what the legislature intended [it] to mean. . . . In interpreting a statute, common sense must be used . . . . The law favors rational and sensible statutory construction. . . . The unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of an act is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable. . . . When two constructions are possible, courts will adopt the one which makes the [statute] effective and workable, and not one which leads to difficult and possibly bizarre results. . . . We have long followed the guideline that [t]he intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star of the court. It must prevail over the literal sense and the precise letter of the language of the statute. . . . When one construction leads to public mischief which another construction will avoid, the latter is to be favored unless the terms of the statute absolutely forbid [it]." (Internal quotation marks omitted.) *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 407, 780 A.2d 903 (2001).

Common sense dictates that the pawnbroking statutes govern pawnbroking transactions; *Rhodes* dictates that they do and the legislative record does not provide clear and unequivocal evidence that the legislature ever has disagreed with that proposition. I therefore disagree with part I of the majority opinion.

## II

### THE USURY STATUTE DOES NOT GOVERN PAWNBROKERS

In order to conclude that § 37-4, the general usury statute, applies to pawnbrokers, the majority not only must ignore the statute's express statement to the contrary, it must also infer that in 1997, when the legislature amended the pawnbroking statutes in an amendment that focused on stemming the flow of stolen goods; P.A. 97-164; it simultaneously, without a single stroke of the pen, or even an oblique reference anywhere in the legislative record, amended the general usury statute, which is in a completely different statutory scheme, to exclude pawnbrokers only when they are engaged in certain transactions.

The third question certified by the District Court, to be addressed only if we answered the first two questions in the negative, requires us to determine whether repurchase transactions constitute loans subject to the interest rate limits imposed by § 37-4. "No person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 21-44, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefore interest at a rate greater than twelve per cent per annum." General Statutes § 37-4. The majority seizes on the phrase "as provided in section 21-44" in § 37-4 to claim that, when the legislature amended General Statutes (Rev. to 1997) § 21-44 in P.A. 97-164 to exclude repurchase transactions, it simultaneously changed the meaning of "a pawnbroker as provided in section 21-44" to apply only to pawnbrokers engaged in pawnbroking loans. The ceiling on interest rates is lower in § 37-4 than the maximum allowable rate in § 21-44. When the majority's analysis of the supposed evolution of §§ 21-44 and 37-4 is viewed as a whole, it is claiming that in 1997, the legislature decided to overrule *Rhodes*, with the purpose of decreasing the maximum amount that pawnbrokers may charge in repurchase transactions, and that it accomplished this purpose by bringing repurchase transactions within the scope of § 37-4. The arbitrariness of this supposed switch cannot be understated. The majority provides no explanation as to why the legislature would draw a distinction between repurchase transactions and pawnbroking loans, why the legislature would do so without any evidence in the record that a single person or entity

ever sought such a change, or why the legislature would accomplish this bizarre change without any acknowledgment of its intent. In addition to all of these more global problems, the majority's conclusion is not reconcilable with the meaning of the phrase "a pawnbroker as provided in section 21-44" when it is understood in the context of the statutory scheme as a whole, and the evolution of § 37-4 in particular.

The majority's error is apparent when one consults the plain language of § 37-4, which does not exclude a particular class or classes of transactions from its rate limits, but instead excludes a particular class of persons—*pawnbrokers*. The majority then compounds that error by misconstruing the nature of the analytical problem presented by the statutory language. Instead of seeking to explain why the phrase "other than a pawnbroker as provided in section 21-44" in § 37-4 should be understood to exclude particular transactions rather than a class of persons, the majority appears to believe that the question of statutory construction is much easier—it seems to think that if it can demonstrate that § 37-4 is intended to apply to loans that involve the "indirect" charging of interest, then it has demonstrated that the legislature intended to subject repurchase transactions to § 37-4. After setting forth the statutory text of § 37-4, the majority, rather than examining that text and then reviewing the language of related statutes, proceeds directly to case law setting forth the well established principle that usury statutes apply to usurious loans regardless of the name by which the lender designates the loan. I am in complete agreement with that uncontroversial proposition, which could have been supported simply by referring to the plain language of § 37-4, which provides that, for the persons and entities that are subject to it, the rate limit applies to direct and indirect loans, and to rates that constitute the direct and indirect charging of interest. The majority then changes the inquiry, focusing on the meaning of the phrase "directly or indirectly," in § 37-4, a phrase that this court already has interpreted in *Rhodes*, rather than the meaning of the phrase "other than a pawnbroker as provided in section 21-44." By doing so, the majority misconstrues the nature of the question of statutory construction presented in this certified question, and, as I explain herein, for the second time in this appeal, fails to give proper effect to one of this court's prior interpretations of a statute.

The scope of § 37-4 is defined by the classes of individuals to which the statute applies, namely, persons, firms and corporations or agents thereof—and one class of individuals to which it does not apply, pawnbrokers, who are governed by § 21-44. In other words, § 37-4 does not exclude particular transactions from its purview; it excludes an entire category of lenders from its application. That does not mean that there are no particular transactions excluded from the rate limit in § 37-4. To

identify those transactions, I turn to the extensive list set forth in General Statutes § 37-9.[10] Section 37-9 identifies seven different categories of transactions, most of which also contain several subcategories, to which § 37-4 does not apply. Reading the two statutes together clarifies that § 37-4 identifies the classes of individuals that are subject to its rate limits, while § 37-9 identifies, for those classes that are subject to § 37-4, which transactions are nonetheless exempt from the rate limit. Significantly, a pawnbroking loan is not listed in § 37-9 as one of the transactions that is excluded from the limit set forth in § 37-4, reinforcing the conclusion that pawnbrokers as an entire class are excluded from § 37-4. The extensiveness of the list of excluded transactions set forth in § 37-9 is significant in light of the principle of statutory construction that "[u]nless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." (Internal quotation marks omitted.) *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 101, 653 A.2d 782 (1995).

The legislative history of the exception in § 37-4 demonstrates that, rather than functioning as a limit on the class of persons to which the exception applies, namely, pawnbrokers, the phrase, "as provided in section 21-44" provides a cross-reference to the applicable rate limit for pawnbrokers. The cross-reference initially appeared when the usury statute was originally enacted in 1907. Public Acts 1907, c. 238. At that time, the pawnbroking statutory scheme had not yet been delineated into separate statutes; see Public Acts 1905, c. 235; so the usury statute cross-referenced the entire chapter of the Public Act that set forth the laws governing the business of pawnbroking, excluding pawnbrokers from the application of the usury statute. As soon as the pawnbroking statutory scheme was set forth in separate statutory sections in 1918, however, the cross-reference to the pawnbroking statutes in the usury statute's exclusion of pawnbrokers was made more specific, expressly referencing the statutory provision that set forth the rate limits governing pawnbrokers. See General Statutes (1918 Rev.) § 4798 ("[n]o person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 3011, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive, therefor, interest at a rate greater than twelve per centum per annum"); General Statutes (1918 Rev.) § 3011 ("[p]awnbrokers and loan brokers, and all persons who loan money on the pledge of personal property, are prohibited from taking or receiving directly or indirectly, for the use of money loaned on personal property, any more than the following rates"). The most reasonable interpretation of the change in cross-reference is that the legislature took the opportunity to make the cross-reference to the

pawnbroking statutes more precise when the different pawnbroking provisions were designated by distinct statutory sections. The most logical choice for a more precise cross-reference, since the usury statute provided that the rate limits set forth therein did not apply to pawnbrokers, was to reference the rate-limiting statute that *did* apply to pawnbrokers. That is exactly what the legislature did in 1918. The same cross-reference is in the statutory text today, and refers to § 21-44 for the rate limits governing pawnbrokers.

Our case law confirms that § 37-4 delineates pawnbrokers as a class of individuals not subject to its rate limit. Specifically, we already have construed the predecessor to § 37-4 to exclude pawnbrokers as a class from the rate limits set forth therein. In *State* v. *Hurlburt*, 82 Conn. 232, 233, 72 A. 1079 (1909), the defendants appealed from the judgment of conviction for violating the predecessor to § 37-4 (then chapter 238 of the 1907 Public Acts)[11] on the basis that the statute violated their right to equal protection under both the state and federal constitutions, by restricting the interest rates that some classes of persons could charge, while exempting other classes of persons from the rate limits. This court rejected the claim, concluding that there were reasonable bases for the distinctions drawn by the legislature, but the court did not reject the premise on which the claim rested, that the general usury statute excluded pawnbrokers as an entire class from its effect. Instead, this court endorsed that interpretation of the statute. Specifically, as to the exclusion of pawnbrokers as a class from the interest rate limits of the general usury statute, this court stated: "There was . . . reasonable cause for the exception as to pawnbrokers. Their business can only be carried on by those found by public authority to be suitable persons to engage in it, and its character is such as to make it not improper to allow a charge of interest beyond the limit of [15 percent] a year. Public Acts [1905, c. 235, p. 438]." *State* v. *Hurlburt*, supra, 234. *Hurlburt* makes clear that the predecessor to § 37-4 distinguishes among classes of individuals, and that the exclusion in the predecessor to § 37-4 applies to pawnbrokers as a class, not to one type of transaction in which pawnbrokers might enter. The court in *Hurlburt* grounded its holding on the principle that there was a reasonable basis for allowing pawnbrokers, as a class, to charge a higher rate than other lenders—in the present case, the rate that is set forth in § 21-44. If the legislature disagreed with this court's interpretation of the predecessor to § 37-4 in *Hurlburt*, it could have amended the usury statute to clarify its intent, as surmised by the majority, that the exclusion in the usury statute functions as one with an elastic scope, expanding and contracting in harmony with § 21-44. Instead, by remaining silent, the legislature acquiesced to our reading of the exclusion as one intended to identify a class of individuals excepted from the

limits set forth in § 37-4.

My construction of §§ 21-44 and 37-4, which results in the same interest rate limits applying to both pawnbroking loans and repurchase transactions, is also consistent with a basic principle of usury law, namely, that it is the nature of the transaction, rather than the parties' designation, that controls the governing rules. See 53A Am. Jur. 2d 796, Moneylenders and Pawnbrokers § 2 (2006); see also *Kjar* v. *Brimley*, 27 Utah 2d 411, 416, 497 P.2d 23 (1972) ("casting a loan transaction in the form of a sale with an option to repurchase will not insulate the transaction from usury laws"). The majority's statutory construction, by contrast, violates that basic principle by effectively allowing pawnbrokers to determine which rules govern their transactions by selecting the designation that yields the most favorable rate limits. That is, under the majority's construction of §§ 21-44 and 37-4, pawnbrokers who wish to charge the higher interest rates allowed under § 21-44 may simply label the transaction a pawnbroking loan.

In summary, I find the majority's interpretation of § 37-4—that the phrase "other than a pawnbroker as provided in section 21-44" refers only to pawnbroking loans—unpersuasive. That interpretation must take as its starting point that the phrase "as provided in section 21-44" was intended to limit the scope of the exception in § 37-4, rather than function as a practical cross-reference to the applicable rate limit for pawnbrokers. As I have explained, that assumption is not supported by the plain language of the statute, particularly when it is read together with § 37-9. The majority's interpretation further ignores our prior interpretation of the statute, to which the legislature has acquiesced. *State* v. *Moulton*, 310 Conn. 337, 361 n.22, 78 A.3d 55 (2013) (acknowledging that "under the doctrine of legislative acquiescence, legislative cognizance of the courts' prior interpretation of [a statute is] presumed, and the failure of the legislature to enact corrective legislation constitute[s] evidence of its agreement with that interpretation"). The more reasonable reading of § 37-4 is that it excludes pawnbrokers as a class of persons, who continue to be governed by § 21-44, regardless of which name they append to their transactions, as this court held in *Rhodes*.

Accordingly, I dissent.

[1] The three questions certified by the District Court are as follows: "1. Does [General Statutes] § 21-44 restrict 'rates of interest' chargeable by a pawnbroker, or does it more generally restrict the 'rates' chargeable for the use of money obtained from a pawnbroker in connection with a repurchase transaction?

"2. Did the Connecticut legislature, in its 1997 amendment to . . . § 21-44, exempt repurchase transactions and the attendant fees charged from the limits on rates received by pawnbrokers?

"3. If so, are repurchase transactions, as described by the court in *Rhodes* v. [*Hartford*, 201 Conn. 89, 513 A.2d 124] (1986), considered loans subject to the interest rate limits imposed by [General Statutes] § 37-4?"

[2] General Statutes § 21-44 provides: "No pawnbroker or person who loans money on the deposit or pledge of personal property shall take or receive,

for the use of money loaned on personal property, any more than the following rates: For the use of money amounting to fifteen dollars or less, five per cent per month or fraction thereof; for the use of money exceeding fifteen dollars in amount and not exceeding fifty dollars in amount, three per cent per month or fraction thereof; for the use of money exceeding fifty dollars in amount, two per cent per month or fraction thereof."

[3] General Statutes § 37-4 provides: "No person and no firm or corporation or agent thereof, other than a pawnbroker as provided in section 21-44, shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum."

[4] We read General Statutes (Rev. to 1985) § 21-44 together with General Statutes (Rev. to 1985) § 21-45. General Statutes (Rev. to 1985) § 21-45 provides: "No such lender shall sell or dispose of any personal property left with him in pledge for money loaned in less than six months from the day when the same is left in pledge as aforesaid. All such property shall be sold or disposed of, at public or private sale, only after advertisement in a daily newspaper published in the town in which such lender carries on business, at least once two days before the date of the sale or sales, which advertisement shall state the numbers of the pledge tickets representing the property offered for sale, and the date or dates when such tickets were issued."

[5] It is possible that the legislature believed that, in light of the conclusion in *Rhodes* that General Statutes (Rev. to 1985) § 21-44 applies to repurchase transactions, the phrase "directly or indirectly" was no longer necessary. It is also entirely possible that the legislature viewed the change as a clarifying technical change. See, e.g., *Historic District Commission* v. *Hall*, 282 Conn. 672, 679 n.7, 923 A.2d 726 (2007) (noting legislative history discussing amendment that "would clarify and make a broad range of substantive and technical changes in the law governing the formation and operation of historic districts created by municipalities" [internal quotation marks omitted]). The truth is that the legislative record does not resolve the ambiguity. It is unnecessary, however, to determine definitively what the legislature did intend, because the only question presented is whether it is clear that the legislature intended to overrule *Rhodes* by amending § 21-44 in 1997. The absence of clear evidence of that intent requires us to construe the change in a manner consistent with *Rhodes*. The existence of reasonable alternative readings of the amendment is sufficient.

[6] The majority overlooks the fact that the pawnbroking statutes recognize that pawnbrokers engage in outright sales. That is, in addition to referring to purchasing property on condition of selling the same back again at a stipulated price, the pawnbroking statutes also refer to outright purchase transactions, which of course are the transactions most likely to be connected to the flow of stolen goods.

[7] The majority's explanation for the conflation of the two terms is unconvincing. The opinion surmises that it is the result of a "drafting error." See footnote 13 of the majority opinion.

[8] The majority inverts the proper presumption that applies when inferring legislative intent to overrule one of our interpretive decisions. Specifically, the majority relies on the fact that the legislature has not amended § 21-44 to refer to repurchase transactions as support for its claim that the legislature has therefore failed to make its intent not to overrule *Rhodes* clear.

[9] The mere fact that the definition of pawnbroker in § 21-39a (1) incorporates the transaction names used by pawnbrokers does not, as claimed by the majority, constitute a clear rejection of this court's recognition in *Rhodes* that the transactions are different in name only; *Rhodes* v. *Hartford*, supra, 201 Conn. 96; a principle on which the majority relies in its analysis of § 37-4. Rather, the inclusion of both terms in the definition of the practice of pawnbroking is consistent with the evolution of the pawnbroking statutes as making more clear over time that repurchase transactions and pawnbroking loans are covered equally by the pawnbroking statutes.

[10] General Statutes § 37-9 provides: "The provisions of sections 37-4, 37-5 and 37-6 shall not affect: (1) Any loan made prior to September 12, 1911; (2) any loan made by (A) any bank, as defined in section 36a-2, or any out-of-state bank, as defined in section 36a-2, that maintains in this state a branch, as defined in section 36a-410, (B) any wholly-owned subsidiary of such bank or out-of-state bank, except a loan for consumer purposes, or (C) any Connecticut credit union, as defined in section 36a-2, or federal credit union, as defined in section 36a-2; (3) any bona fide mortgage of real property for a sum in excess of five thousand dollars; (4) (A) any loan, carrying an annual interest rate of not more than the deposit index deter-

mined pursuant to subsection (c) of section 49-2a for the calendar year in which the loan is made plus seventeen per cent, made to a foreign or domestic corporation, statutory trust, limited liability company, general, limited or limited liability partnership or association organized for a profit or any individual, provided such corporation, trust, company, partnership, association or individual is engaged primarily in commercial, manufacturing, industrial or nonconsumer pursuits and provided further that the funds received by such corporation, trust, company, partnership, association or individual are utilized in such entity's business or investment activities and are not utilized for consumer purposes and provided further that the original indebtedness to be repaid is in excess of ten thousand dollars but less than or equal to two hundred fifty thousand dollars, or, in the case of one or more advances of money of less than ten thousand dollars made pursuant to a revolving loan agreement or similar agreement or a loan agreement providing for the making of advances to the borrower from time to time up to an aggregate maximum amount, the total principal amount of all loans owing by the borrower to the lender at the time of any such advance is in excess of ten thousand dollars but less than or equal to two hundred fifty thousand dollars, or (B) any loan made to a foreign or domestic corporation, statutory trust, limited liability company, general, limited or limited liability partnership or association organized for a profit or any individual, provided such corporation, trust, company, partnership, association or individual is engaged primarily in commercial, manufacturing, industrial or nonconsumer pursuits and provided further that the funds received by such corporation, trust, company, partnership, association or individual are utilized in such entity's business or investment activities and are not utilized for consumer purposes and provided further that the original indebtedness to be repaid is in excess of two hundred fifty thousand dollars, or, in the case of one or more advances of money of less than two hundred fifty thousand dollars made pursuant to a revolving loan agreement or similar agreement or a loan agreement providing for the making of advances to the borrower from time to time up to an aggregate maximum amount, the total principal amount of all loans owing by the borrower to the lender at the time of any such advance is in excess of two hundred fifty thousand dollars; (5) any obligations, including bonds, notes or other obligations, issued by (A) the state, (B) any municipality, including any city, town, borough, district, whether consolidated or not, or other public body corporate, or (C) any authority, instrumentality, public agency or other political subdivision of the state or of a municipality; (6) any loan made by (A) the state, (B) any municipality, including any city, town, borough, district, whether consolidated or not, or other public body corporate, or (C) any authority, instrumentality, public agency or other political subdivision of the state or of a municipality; (7) any loan made for the purpose of financing the purchase of a motor vehicle, a recreational vehicle or a boat, carrying an interest rate of not more than (A) eighteen per cent per annum on loans made on or after July 1, 1981, and prior to October 1, 1985, and (B) on loans made on or after October 1, 1985, and prior to October 1, 1993, (i) sixteen per cent per annum for new motor vehicles, recreational vehicles or boats, and (ii) eighteen per cent per annum for used motor vehicles, recreational vehicles or boats, payable in four or more monthly, quarterly or yearly installments which is unsecured or in which a security interest is taken in such property; (8) any loan by an institution of higher education made to an individual for the purpose of enabling attendance at such institution and carrying an interest rate of not more than the greater of (A) the maximum rate then permitted by section 37-4, or (B) a rate which is not more than five per cent in excess of the discount rate, including any surcharge, on ninety-day commercial paper in effect from time to time at the federal reserve bank in the federal reserve district where such institution is located; (9) any loan made to a plan participant or beneficiary from an employee pension benefit plan as defined in the Employee Retirement Income Security Act of 1974, Public Law 93-406, as from time to time amended. The provisions of part III of chapter 668 shall not apply to loans made pursuant to subdivision (7) of this section. No provision of this section shall prevent any such bank, out-of-state bank, Connecticut credit union or federal credit union or other lender from recovering by an action at law the amount of the principal and the interest stipulated or interest at the legal rate, if interest is not stipulated, in any negotiable instrument which it has acquired for value and in good faith without notice of illegality in the consideration. For the purpose of this section: 'Interest' shall not be construed to include attorney's fees, including preparation of mortgage deed and note, security agreements, title search, waivers and closing fees, survey charges or recording fees paid by the mortgagor or borrower; 'consumer purposes' shall mean the utilization of funds for personal, family or household purchases, acquisitions or uses."

[11] Chapter 238, § 1, of the 1907 Public Acts provides: "No person, firm, or

corporation, or any agent thereof, other than a national bank or a bank or trust company duly incorporated under the laws of this state or a pawnbroker as provided in chapter 235 of the public acts of 1905, shall directly or indirectly loan money to any person and directly or indirectly charge, demand, accept, or make an agreement to receive therefor, interest at a greater rate than fifteen per centum per annum. The provisions of this section shall not apply to loans made to any national bank or any bank or trust company duly incorporated under the laws of this state, or to any bona fide mortgage of real or personal property."

---